UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SANDRA TORRES,

Plaintiff,

-v-

TRUSTEES OF ST. PATRICK'S CATHEDRAL *and* ARCHDIOCESE OF NEW YORK,

Defendants.

25 Civ. 1191 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Sandra Torres brings this employment discrimination suit against her former employer, the Trustees of St. Patrick's Cathedral (the "Trustees"), and against the Archdiocese of New York (the "Archdiocese") (with the Trustees, "defendants"). Against both defendants, Torres brings federal- and state-law claims of race, national origin, sex, and age discrimination; retaliation; and intentional infliction of emotional distress. Against the Archdiocese alone, she brings a claim for interference with contractual rights.

Before the Court is defendants' motion for summary judgment. For the reasons that follow, the Court grants the motion in full.

# I. Background[1]

## A. Factual History

### 1. The Parties

Torres is a Puerto Rican woman born in 1962. Dkt. 47 ("Defs.' 56.1") ¶ 17.

The Archdiocese is a Catholic diocese serving 368 parishes in 10 counties in New York. *Id.* ¶ 1. It provides a range of services to its parishioners and community members, including charitable, educational, and healthcare-related ministries. *Id.*

The Trustees is a Roman-Catholic religious corporation created by the New York Legislature in 1817. *Id.* ¶ 2. It is responsible for the facility operations of St. Patrick's Cathedral in New York City, and it owns and operates several Catholic cemeteries in the New York City metropolitan area. *Id.* ¶ 4.

The Archdiocese and the Trustees are affiliated and often work together. *Id.* ¶ 3. For instance, the Trustees contracts with the Archdiocese for the provision of certain services, including legal and payroll-related functions, for which the Trustees pays the Archdiocese. *Id.*

---

[1] The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motion, including defendants' Local Rule 56.1 statement of undisputed, material facts, Dkt. 47 ("Defs.' 56.1"); the declaration of Wendy J. Mellk in support of the motion, Dkt. 48 ("Mellk Decl.") and attached exhibits (Exhs. A–DD); the affidavits of Mary Ellen Gerrity, Dkts. 49, 57, Ella O'Sullivan, Dkt. 50, and Wendy J. Mellk, Dkt. 58, in support; and Torres' affidavit, Dkt. 55, in opposition.

Torres did not oppose defendants' Rule 56.1 statement, including after the Court *sua sponte* extended the deadline for Torres to do so. *See* Dkt. 61. Rule 56.1 provides that "[e]ach numbered paragraph in the statement of material facts set forth in [the movant's statement] will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." S.D.N.Y. Loc. Civ. R. 56.1(c); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). The Court finds each fact in defendants' Rule 56.1 statement supported by admissible testimonial or documentary evidence to be true. Citations to defendants' Rule 56.1 statement incorporate by reference the evidence cited therein.

¶ 75. But the Archdiocese and the Trustees are separate and distinct legal, corporate, and employing entities. *Id.* ¶¶ 3, 8. Archdiocese employees, but not Trustees employees, are formally employed by Central Services, a nonprofit corporation. *Id.* ¶ 8.[2]

### 2. Torres' Employment with the Trustees

#### *a. Torres' job responsibilities*

In 2002, the Trustees hired Torres to perform human resources–related data-entry functions. *Id.* ¶ 14. At that time, Torres had no educational background in human resources, having left school before completing eighth grade. *Id.* ¶¶ 15–16. Torres was hired "at will"; her employment was not governed by an employment contract. *Id.* ¶ 18.

When Torres commenced work for the Trustees, she reported to the assistant to the Trustees' managing director. *Id.* ¶ 28. After those individuals retired, Torres reported to the new managing director, George Borrero, for about 10 years. *Id.* ¶ 29. In 2005, Borrero changed Torres' job title to human resources manager. *Id.* ¶ 31; Mellk Decl., Exh. M. As human resources manager, Torres assumed additional responsibilities, such as processing health-insurance bills for unionized employees, coordinating meetings between union employees and management, and being the "point person" for escalating employee concerns to the managing director. Defs.' 56.1 ¶¶ 32–34. She also conducted initial interviews of employment candidates, checked applicants' references, and ensured administrative work related to interviewing and hiring was completed. *Id.* ¶ 36. She was not responsible for ensuring that human resources–related forms and policies were compliant with law nor for developing or drafting policies; instead, she consulted outside counsel and relied on counsel or management to update policies, and at times relayed legal advice from outside counsel to senior management. *Id.* ¶¶ 35, 37.

---

[2] For the purpose of resolving the motion for summary judgment, the Court refers to the Archdiocese and Central Services, individually and collectively, as the "Archdiocese."

In early 2020, the Trustees' managing director, Scott Hanley, changed Torres' title to director of human resources, to reflect the additional responsibility of liaising between the unionized cemetery field employees and management. *Id.* ¶ 41. Her responsibilities otherwise remained the same. *Id.* ¶ 43.

*b. Torres' salary and supplemental pension*

At the time Torres was hired in 2002, her salary was $30,840. *Id.* ¶ 27. By early 2020, Torres' salary was $76,358. *Id.* ¶ 44. In February 2020, when Torres' job title was changed from human resources manager to director of human resources, her salary was increased to $80,176. *Id.*; Mellk Decl., Exh. M. She also received a 2% annual salary increase, which brought her salary to $81,779. Defs.' 56.1 ¶ 45. When Torres was terminated in May 2023, her salary was $86,607.96. *Id.* ¶ 122.

Throughout her employment with the Trustees, Torres participated in a pension plan managed and administered by the Trustees, the "supplemental pension." *Id.* ¶¶ 20, 22. The supplemental pension is available only to Trustees employees. *Id.* ¶ 21. On January 1, 2011, the Trustees ceased providing the supplemental pension to new employees, but continued to make contributions for employees, like Torres, who were already enrolled. *Id.* ¶ 23. Participants in the supplemental pension are eligible to receive benefits upon either (1) their normal retirement date, which is the later of age 65 or the completion of 10 years of credited service; or (2) early, *i.e.*, any time after they turn 62, if they have at least 15 years of credited service. *Id.* ¶ 25; *see also* Mellk Decl., Exh. I, at 6. In September 2024, after Torres turned 62, she elected to receive supplemental pension benefits. Defs.' 56.1 ¶ 26.

### 3. Torres' Termination

#### *a. Changes to Trustees leadership*

In May 2022, Hanley left the Trustees. *Id.* ¶ 47. Hanley's managing-director responsibilities were merged into an executive directorship, which Mary Ellen Gerrity assumed in July 2022. *Id.* ¶¶ 48, 50. Gerrity undertook review of the Trustees' operational structure and workforce. *Id.* ¶ 51. This review revealed operational redundancies, such as overlapping job duties and unrelated job titles. *Id.* ¶ 52. Gerrity began to restructure the Trustees and streamline the management team, including eliminating unnecessary and duplicative positions through attrition and job elimination. *Id.* ¶ 53. Among the roles eliminated were those of Louis Bertuzzi (director of financial operations and director of cemetery field operations) and Andrew Nagle (assistant managing director). They were laid off in February 2023. *Id.* ¶¶ 54, 187–188.

#### *b. Elimination of Torres' role*

As Gerrity familiarized herself with the Trustees' operations, she became concerned about Torres' ability to manage the Trustees' human-resources functions. *Id.* ¶ 56. In particular, Gerrity felt that Torres was insufficiently familiar with the Trustees' policies and unreasonably relied on outside counsel, incurring unnecessary costs. *Id.* ¶ 57. For instance, upon learning that most senior management worked only 32.5 hours per week, Gerrity sought clarification from Torres, who incorrectly informed Gerrity that Trustees policy limited certain positions to 32.5 hours per week; in fact, 32.5 hours per week was the minimum hours requirement for eligibility for full-time status and associated benefits, not the maximum number of work-hours permitted. *Id.* ¶¶ 58–59, 62. Gerrity also discovered inconsistencies between the Trustees' written policies and actual practice concerning vacation payout, which resulted in confusion and potential inequities between employees. *Id.* ¶ 66. Gerrity also grew concerned about Torres' difficulty identifying potential workplace legal exposure—such as the Trustees' use of multiple unlawful

questions on its employment application—or determining whether an employee was exempt or non-exempt for wage-hour-law purposes. *Id.* ¶¶ 69–71. Gerrity was further concerned by Torres' written work product, which was often riddled with errors that Gerrity asked Torres to correct. *Id.* ¶ 67. Finally, Gerrity felt that Torres aligned herself with other long-term employees unhappy with Gerrity's organizational changes and thereby undermined Gerrity's efforts to make these changes, such as requiring non-unionized employees to work either 8 a.m. to 4 p.m. or 9 a.m. to 5 p.m. and to work in person four days per week. *Id.* ¶¶ 63–65.

In or around April 2023, Gerrity decided to eliminate the Trustees' internal human-resources functions, and instead to contract with the Archdiocese to purchase human-resources services. *Id.* ¶ 73. That decision eliminated Torres' role, as she was the Trustees' sole human-resources employee. *Id.* ¶ 74. The outsourcing of the Trustees' human-resources function to the Archdiocese was to be effective May 15, 2023. *Id.* ¶ 73.

On or before May 3, 2023, Gerrity discussed the upcoming outsourcing with Ella O'Sullivan, the Archdiocese's executive director of human resources. *Id.* ¶¶ 6, 76. O'Sullivan informed Gerrity that she would offer Torres a position on the Archdiocese human-resources team, acting as human-resources liaison to the Trustees, due to her familiarity with the Trustees organization. *Id.* ¶¶ 76–77.

*c. The Archdiocese job offer*

On May 3, 2023, Gerrity and O'Sullivan met with Torres to inform her that, effective May 15, 2023, her role would be eliminated due to Gerrity's decision to outsource human-resources services to the Archdiocese. *Id.* ¶ 79. O'Sullivan offered Torres a position with the Archdiocese's human-resources department and explained that, should Torres accept the job offer, she would become an Archdiocese employee, subject to Archdiocese policies and eligible for Archdiocese benefits. *Id.* ¶¶ 81–82. O'Sullivan explained that Torres' salary and scheduling

options would be the same, and her responsibilities would be similar, but she would be an Archdiocese employee working under O'Sullivan's supervision. *Id.* ¶¶ 83–84. Torres was informed at that meeting that, because she was being offered a comparable job with the Archdiocese, the Trustees would not offer her severance. *Id.* ¶ 85. Torres understood the reasoning behind Gerrity's decision to eliminate the Trustees' human-resources function, and did not believe that the decision was discriminatory or retaliatory. *Id.* ¶ 89; *see also* Mellk Decl., Exh. E ("Pl. Dep.") at 318–19.

At the May 3, 2023 meeting, O'Sullivan asked Torres to respond to the job offer by that Monday, May 8. Defs.' 56.1 ¶ 86. On Friday, May 5, O'Sullivan scheduled a follow-up meeting with Torres, at which O'Sullivan reiterated that she needed confirmation from Torres about whether she would accept the Archdiocese job. *Id.* ¶ 90. On May 8, Gerrity and O'Sullivan met with Torres, and Torres asked whether O'Sullivan could extend her time to respond to the job offer to May 12. *Id.* ¶¶ 92–93. Because O'Sullivan would be out of the office on May 12, O'Sullivan agreed to extend Torres' time to respond to May 11. *Id.* ¶ 94. Torres understood May 11 to be her deadline to respond to the offer. *Id.* ¶ 95. After the May 8 meeting, Torres emailed O'Sullivan questions about the logistics and compensation of the Archdiocese role, including whether she would remain eligible to participate in the Trustees' supplemental pension. *Id.* ¶¶ 96–97. On May 9, O'Sullivan responded to that inquiry, stating that Torres would not lose any supplemental pension benefits, but contributions would cease because she would be an employee of the Archdiocese, not the Trustees. *Id.* ¶ 98.

On the evening of May 8, Torres emailed Roderick Cassidy, general counsel of the Archdiocese, complaining that she was a "60-year old Hispanic female" whom Gerrity "disrespected, mistreated, and victimized" "through adult bullying." *Id.* ¶ 100. Within 20

minutes of that email, Cassidy responded, offering to meet with Torres the next day, May 9. *Id.* ¶ 104. Torres was unable to meet with him on that day; on May 10 and 11, she called out sick. *Id.* ¶ 105.

Torres did not accept the Archdiocese job offer on or before May 11, 2023. *Id.* ¶ 106. She did not ask O'Sullivan to extend the deadline to respond to the job offer beyond that date. *Id.* ¶ 107.

On May 11, 2023, Torres' lawyer, Patrick Johnson, sent a letter to O'Sullivan demanding that Torres be given more time to decide whether to accept the Archdiocese offer "so that she may consult with counsel" and that O'Sullivan should confirm in writing that, should Torres accept the "transfer," her employment with the Archdiocese would be attributable to her pension. *Id.* ¶¶ 111, 113–114. O'Sullivan shared Johnson's letter with Cassidy, after which point Cassidy communicated directly with Johnson. *Id.* ¶ 115. Cassidy wrote to Johnson on May 12, via a letter and an email, explaining that the Archdiocese and the Trustees were separate organizations and that, because Torres had not accepted employment at the Archdiocese and the deadline to do so had passed, Torres would not be employed by either the Trustees or the Archdiocese come Monday, May 15. *Id.* ¶¶ 116–117.

On May 15, 2023, Torres entered the Archdiocese building to commence work. *Id.* ¶ 118. When O'Sullivan arrived to work that day, she reminded Torres that the deadline to accept the position with the Archdiocese had passed and that the role was no longer available. *Id.* ¶ 120. That position was never filled. *Id.* ¶ 121. The Trustees continue to contract with the Archdiocese for the provision of human-resources services. *Id.* ¶ 121.

**B. Procedural History**

On November 14, 2024, the Equal Employment Opportunity Commission issued Torres a Notice of Right to Sue. *See* Dkt 1 at 1. On December 30, 2024, Torres initiated this action in the

United States District Court for the Eastern District of New York. *Id*. On January 14, 2025, the case was transferred to this District and assigned to this Court. Dkt. 9.

On June 17, 2025, Torres filed the amended complaint. Dkt. 27 ("AC"). It brings six claims, five of which—gender discrimination under Title VII; gender-based discrimination and retaliation under Title VII; age discrimination under the Age Discrimination in Employment Act (the "ADEA"); race, sex, color, and national origin discrimination under the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL") and race, color, ethnicity, and national origin discrimination under Title VII; and intentional infliction of emotional distress—are brought against both defendants. The sixth claim, for interference with contractual relations, is brought only against the Archdiocese.

On June 24, 2025, defendants answered the AC. Dkt. 28. On March 11, 2026, after the close of discovery, defendants moved for summary judgment. Dkt. 45. On April 6, 2026, Torres opposed. Dkt. 52 ("Opp'n"). On April 22, 2026, defendants replied. Dkt. 56.

## II. Applicable Legal Standards

To prevail on a motion for summary judgment, the movant bears the burden of "show[ing] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party, *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), resolving "all ambiguities" in the non-movant's favor, *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "Only disputes over facts that might affect the outcome of the suit under the

governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in deciding whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). But "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Colum. Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in such a case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137 (citation omitted); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against

"discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III. Discussion

Torres brings claims of discrimination based on numerous protected characteristics. Under Title VII of the Civil Rights Act of 1964, she brings claims for gender-based discrimination, retaliation, and hostile work environment (Counts One and Two); and for discrimination based on race, color, "ethnic characteristics," and national origin (Count Four). Under the ADEA, she claims discrimination on the basis of age (Count Three). Under the NYSHRL, she claims discrimination based on race, sex, color, and national origin (Count Four). She brings a separate claim for what she calls "intentional infliction of emotional distress discrimination under Title VII," which the Court construes as a common-law tort claim for intentional infliction of emotional distress (Count Five). And she brings, against the Archdiocese alone, a claim for interference with contractual relations, which recites Title VII's protections but which the Court construes as a common-law claim for tortious interference with contractual relations (Count Six).

As developed below, discovery has not uncovered admissible evidence sufficient to support any of these claims. The Court accordingly grants summary judgment to defendants on all claims.

### A. Discrimination and Retaliation Claims Under Title VII and the ADEA

Defendants move against Torres' claims for race-, color-, national origin–, ethnicity-, sex-, and gender-based discrimination and retaliation under Title VII and the ADEA. Dkt. 46 ("Mot.") at 9, 21.

### 1. The *McDonnell-Douglas* Framework

The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in this case.[3] That framework, developed in the context of Title VII discrimination claims, also applies to claims of age discrimination under the ADEA. *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012); *see also Gorzynski*, 596 F.3d at 107, 110.

Under the *McDonnell-Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (quoting *Weinstock*, 224 F.3d at 42). If a plaintiff establishes a *prima facie* case, a presumption arises that, more likely than not, "the adverse conduct was based on the consideration of impermissible factors." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)). At that point, the burden shifts to the employer, which must "articulate some legitimate, nondiscriminatory reason" for the disparate treatment. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer articulates such a reason, the burden shifts back to the plaintiff, who must prove that the employer's proffered reason "was in fact pretext" for discrimination, *id.* (quoting *McDonnell Douglas*, 411 U.S. at 804), and that "discrimination was the real reason for the employment action," *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

---

[3] The *McDonnell-Douglas* framework applies where, as here, a plaintiff does not "produce direct evidence of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *see also* Dkt. 46 ("Mot.") at 9 (applying framework); Dkt. 52 ("Opp'n") at 16 (same).

### 2. Torres Fails to Satisfy Her *Prima Facie* Burden

Defendants do not contest that Torres is a member of a protected class and qualified for her position. Mot. at 9. The Trustees do not contest that Gerrity's decision to terminate Torres constitutes an adverse employment action attributable to the Trustees. *Id.* On the subject of Torres' *prima facie* burden, the only contested issues are whether (1) the termination is also attributable to the Archdiocese, and (2) the circumstances of the termination give rise to an inference of discrimination.

#### *a. Whether the Archdiocese subjected Torres to an adverse employment action*

A broad range of employment decisions can constitute adverse employment actions. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 269 (2d Cir. 2023). "[N]o particular type of personnel action is automatically excluded from serving as the basis of a cause of action under Title VII, as long as the plaintiff is aggrieved by the action." *Id.* at 269–70 (citation omitted). A plaintiff need only show "some injury respecting her employment terms or conditions" that "left her worse off," but not necessarily "significantly so." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 977 (2024); *see also Shapiro v. N.Y.C. Dep't of Educ.*, 561 F. Supp. 2d 413, 422 (S.D.N.Y. 2008) (under ADEA, "a plaintiff suffers an adverse employment action if he or she undergoes a 'materially adverse change' in the terms and conditions of employment."). Here, however, the evidence adduced would not permit a trier of fact to find that the Archdiocese—in contrast to the Trustees—subjected Torres to an adverse employment action.

The Archdiocese never employed Torres. Defs.' 56.1 ¶ 110. The Archdiocese offered Torres a job, which she did not accept by the deadline set. *Id.* As Cassidy explained to Torres' lawyer on May 12, 2023, and as O'Sullivan explained to Torres three days later, the Archdiocese's employment offer expired on May 11. *Id.* ¶¶ 117, 120. Because Torres had not

accepted the offer by that date, she never became an Archdiocese employee. *Id.* ¶ 110. Torres' choice not to accept the offer by the deadline—which she understood, *id.* ¶ 95—does not constitute an adverse employment action. *See Keshinover v. N.Y. State Off. of Parks, Recreation, & Historic Pres.*, 826 Fed. App'x 109, 110 (2d Cir. 2020) (summary order) (plaintiff did not suffer an adverse employment action where he chose to withdraw his application for employment).

Nor did the Archdiocese subject Torres to an adverse employment action by not including in its job offer an opportunity to participate in the supplemental pension. The supplemental pension is a Trustees employment benefit, available only to Trustees employees. Defs.' 56.1 ¶ 146. It is not available to employees of the Archdiocese. *Id.* There is no basis on which to conclude that the Archdiocese subjected Torres to an adverse employment action by not providing her a benefit it lacked authority to offer and had not offered its employees. *See id.* ¶¶ 21, 141, 146, 150.

Torres' claim that the Archdiocese subjected her to an adverse action rests on the premise that the Archdiocese and the Trustees "function as a single entity," such that liability can be found on the Archdiocese's part for the Trustees' termination of Torres and her consequent loss of supplemental pension benefits. Opp'n at 18–19. The single-employer doctrine permits Title VII liability "when two nominally separate entities are part of a single integrated enterprise." *Echevarria v. Insight Med., P.C.*, 72 F. Supp. 3d 442, 458 (S.D.N.Y. 2014) (quoting *Lima v. Addeco*, 634 F. Supp. 2d 394, 399–400 (S.D.N.Y. 2009), *aff'd sub nom. Lima v. Adecco &/or Platform Learning, Inc.*, 375 Fed. App'x 54 (2d Cir. 2010) (summary order)). In the Second Circuit, the single-employer test "has been confined to two corporate contexts: first, where the plaintiff is an employee of a wholly-owned corporate subsidiary; and second, where the

plaintiff's employment is subcontracted by one employer to another, formally distinct, entity." *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 378 (2d Cir. 2006) (citation omitted); *see also Popat v. Levy*, 328 F. Supp. 3d 106, 118–19 (W.D.N.Y. 2018).

Torres has not adduced evidence that would permit a juror to find either circumstance. She notes the undisputed facts that (1) when Gerrity interviewed for her job, she interviewed with the Archdiocese's Chancellor and Cardinal alongside the Trustees' Board; (2) the Trustees contracts with the Archdiocese for certain services; and (3) the Trustees has included its affiliation with the Archdiocese on its letterhead. Opp'n at 9–10. Those facts do not, however, support either that Torres was employed by a wholly-owned subsidiary of the Archdiocese or that she worked for the Trustees as a subcontractor.

On the contrary, the evidence adduced uniformly undermines both theories of single-employer liability. It supports that Gerrity—who undisputedly made the decision to terminate Torres—was hired by the Trustees, reports to the Trustees' board, is paid by the Trustees, and exercises authority on behalf of the Trustees only. Defs.' 56.1 ¶¶ 5, 10, 48–50. And the Trustees and the Archdiocese are separate corporate, legal, and employing entities. *Id.* ¶¶ 3, 136. They maintain distinct employment policies and employee handbooks. *Id.* ¶ 136. Insofar as it has conducted human-resources functions for the Trustees under a contract, the Archdiocese implements Trustees policies, not its own. *Id.* ¶ 121. The record thus would not permit a reasonable juror to find the Trustees and the Archdiocese "part of a single integrated enterprise," *Echevarria*, 72 F. Supp. 3d at 458, or otherwise hold the Archdiocese accountable for Torres' termination (or any other aspect of her treatment as an employee).

*b. Whether the circumstances give rise to an inference of discrimination*

Torres has not adduced direct or indirect evidence of "circumstances giving rise to an inference of discrimination," as to her termination or any other action by either defendant toward her. *Gamble v. Fieldston Lodge Nursing & Rehab. Ctr.*, 697 F. Supp. 3d 112, 120 (S.D.N.Y. 2023). The central inquiry on this point is "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Carter-Marks v. Alstom Transp. USA Inc.*, 800 F. Supp. 3d 423, 454 (E.D.N.Y. 2025) (citing *Abdelal v. Police Comm'r*, 857 Fed. App'x 30, 31 (2d Cir. 2021) (summary order)).

Even viewing the evidence in the light most favorable to Torres, there is nothing that supports such an inference. Torres testified at her deposition that she understood why Gerrity decided to eliminate her role and terminate her employment, and does not believe the decision was discriminatory or retaliatory. Defs.' 56.1 ¶ 89; *see also* Pl. Dep. at 318–19. And she has not mustered any evidence that anyone affiliated with defendants harbored discriminatory animus toward her on any ground or that she was treated less favorably than similarly situated individuals outside her protected class.

To begin, there is no allegation that Gerrity, O'Sullivan, or anyone else acting on defendants' behalf ever made any comment about Torres' age, race, or gender. Defs.' 56.1 ¶ 155. Torres confirmed in her deposition that she was unaware of any such comment. *Id.*; *see also* Pl. Dep. at 324–25. Nor does Torres identify any statement, action, or circumstance suggesting that any decision by a defendant was tied to any protected characteristic of hers.

Instead, Torres relies on her testimony that Gisela Borja, a Hispanic employee who voluntarily resigned from the Trustees, told Torres afterward that it was her subjective belief that Gerrity did not like Borja because Borja is Hispanic. Pl. Dep. at 218–19. But Borja's statement

is hearsay. And Borja did not report facts to Torres supporting that belief. *Id.* at 217–19. And Torres testified that Borja never told her that Gerrity ever engaged in any conduct or made any comment evidencing discriminatory animus during her employment. *Id.* There is no evidence of any complaint by Borja—or any other Trustees or Archdiocese employee—of discrimination or harassment by Gerrity or O'Sullivan. *See* Defs.' 56.1 ¶ 161; Dkt. 49 ¶ 106.

Finally, the evidence does not sustain an inference that Torres was treated less favorably than any similarly situated individual outside her protected class. Torres claims that she was treated less favorably than Andrew Nagle and Louis Bertuzzi—Caucasian males over age 40 who had each worked for the Trustees for more than 20 years as of when Gerrity eliminated their roles. *See* Defs.' 56.1 ¶¶ 54, 133; Pl. Dep. at 166–170. Torres claims she was treated unfavorably relative to Nagle and Bertuzzi because they were offered severance when Gerrity eliminated their roles and she was not. Pl. Dep. at 166–170. But, as Gerrity explained to Torres at the May 3, 2023 meeting, Torres was not offered severance because, unlike Nagle and Bertuzzi, she was offered a job at the Archdiocese. Defs.' 56.1 ¶¶ 85, 134. And even if a jury viewed an offer of severance pay as more favorable than the offer of a comparable job, Nagle and Bertuzzi held different positions than Torres. *Id.* ¶¶ 187–188. Torres has not adduced evidence that would permit a juror to conclude that either was similarly situated to Torres to make them comparators with respect to the offer of severance. *See Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" (quoting *Graham*, 230 F.3d at 39)). That Gerrity eliminated Nagle's and Bertuzzi's roles during the Trustees restructuring also undermines any claim by Torres that the

elimination of her position was the result of discrimination based on any protected characteristic (such as race or gender) that Nagle and Bertuzzi do not share.

For these reasons, Torres has not shown a *prima facie* case of discrimination by either defendant.

**3. Defendants Advance a Legitimate, Non-Discriminatory Reason for Torres' Termination**

Even assuming Torres had carried her *prima facie* burden, defendants have met their burden to come forward with "admissible evidence of legitimate nondiscriminatory reasons for" Torres' termination and consequent ineligibility for further supplemental-pension contributions. *Mandell*, 316 F.3d at 380.

Specifically, defendants assert that Gerrity's decision to eliminate Torres' position and terminate her employment with the Trustees was (1) made in line with broader structural changes to the Trustees, and (2) based on Gerrity's lack of confidence in Torres' ability to adequately support the Trustees' human-resources needs. "The restructuring of operations has repeatedly been recognized by the courts as a legitimate, non-discriminatory reason for termination." *Olle v. Colum. Univ.*, 332 F. Supp. 2d 599, 616–17 (S.D.N.Y. 2004) (collecting cases), *aff'd*, 136 Fed. App'x 383 (2d Cir. 2005) (summary order); *see also Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988) ("corporate reorganization and a concomitant change in business priorities" is a legitimate, non-discriminatory ground for termination). And "[d]issatisfaction with an employee's work performance is a legitimate, non-discriminatory ground for the employee's termination." *Olle*, 332 F. Supp. 2d at 616.

Here, defendants point to admissible evidence supporting that such were the bases for Torres' termination. The evidence supports that Gerrity undertook to restructure the Trustees, including by terminating some employees and not replacing others. Defs.' 56.1 ¶¶ 51–54. There

is also evidence that Gerrity's decision to eliminate Torres' role was motivated by Gerrity's discovery that the Trustees human-resources department—of which Torres was the sole member—was inconsistently and incorrectly applying employment policies, and asking unlawful questions on employment applications. *Id.* ¶¶ 58–59, 62, 66, 70–71. As to Torres' performance, Gerrity testified that she was concerned that Torres was unskilled in identifying workplace legal exposures, unreasonably relied on outside counsel for decisions, was insufficiently familiar with Trustees policies, and produced poor written work. *Id.* ¶¶ 57, 67, 69, 71. The evidence to this effect is unrebutted. Indeed, Torres testified that she understood the reasons for her termination and does not view them as discriminatory or retaliatory. *See* Pl. Dep. at 318–19.

To the extent that Torres claims that the termination of her eligibility for supplemental-pension benefits bespoke discrimination, defendants have pointed to a neutral basis for that, too. Torres' employment, which had been a precondition for contributions, had terminated; and the Archdiocese was unable to offer Torres supplemental-pension benefits, as such were reserved for Trustees employees. Defs.' 56.1 ¶¶ 21, 141, 146, 150.

For these reasons, even if Torres had made a *prima facie* showing of discrimination by either defendant, defendants satisfied their burden at *McDonnell Douglas*'s second step.

#### 4. Torres Fails to Rebut Defendants' Legitimate Reason to Terminate Her

Because defendants have stated neutral, legitimate grounds for Torres' termination and ineligibility for further supplemental-pension contributions, to defeat summary judgment, Torres' "admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). Torres has not come forward with any evidence impugning as pretextual defendants'

stated bases for terminating Torres' employment with the Trustees, and with it her eligibility for further supplemental-pension benefits. Nor has Torres offered evidence that her termination was motivated in part by discrimination.

The Court thus grants summary judgment to defendants on Torres' discrimination claims under Title VII and the ADEA.

### B. Discrimination Claims Under the NYSHRL

Defendants also move against Torres' race-, color-, national origin–, and sex-based discrimination claims under the NYSHRL. Mot. at 16.

Federal courts historically treated discrimination claims under Title VII and the NYSHRL as "analytically identical" and, on a motion for summary judgment, addressed them together under the *McDonnell-Douglas* framework. *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020) (quoting *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d Cir. 2019)). Meanwhile, claims under the more lenient New York City Human Rights Law, N.Y.C. Admin. Code § 8–502(a) *et seq.* ("NYCHRL"), were analyzed separately from federal- and state-law discrimination claims. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013).

A 2019 amendment to the NYSHRL provided that it was to be "construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300; *see also Farmer v. Mizuho Sec. USA LLC*, 259 N.Y.S.3d 43, 45 (N.Y. App. Div. 2026). The amendment undisputedly moved the statute's substantive standards closer to those of the NYCHRL. *Wright v. White Plains Hosp. Med. Ctr.*, 232 N.Y.S.3d 594, 596 (N.Y. App. Div. 2025) (collecting cases). But the case law has not resolved definitively whether the NYSHRL standards and framework now track the NYCHRL's

or merely are closer to it. *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 578 (S.D.N.Y. 2023) (Engelmayer, J.).[4] Some courts now analyze plaintiffs' claims under the NYSHRL and NYCHRL together, on the premise that they are coterminous or that it is safer to so assume, even if daylight may remain between the two. *See, e.g.*, *Knight v. Metro. Transit Auth.*, No. 19 Civ. 1428, 2026 WL 875339, at *3 (E.D.N.Y. Mar. 31, 2026); *Faustin v. N.Y. & Presbyterian Hosp.*, No. 23 Civ. 8323, 2025 WL 1755192, at *5 (S.D.N.Y. June 25, 2025); *Mumin v. City of New York*, 760 F. Supp. 3d 28, 44 (S.D.N.Y. 2024). *But see DeGroat v. Sullivan County*, No. 23 Civ. 2066, 2025 WL 2733632, at *8 (S.D.N.Y. Sept. 25, 2025) (analyzing Title VII and NYSHRL claims together and putting plaintiff to a burden to show that defendants' proffered justification was "a pretext for [] discrimination"). The New York Appellate Division recently advised that a defendants' motions for summary judgment dismissing NYSHRL claims be analyzed both under the *McDonnell-Douglas* framework applicable to direct-evidence Title VII claims and under the more lenient "mixed-motive" framework applicable to circumstantial-evidence Title VII claims and all NYCHRL claims, under which it is enough for a plaintiff to adduce evidence that unlawful discrimination was one of the motivating factors for the adverse employment action. *Wright*, 232 N.Y.S.3d at 596.

The Court here need not re-apply the *McDonnell-Douglas* standard to Torres' NYCHRL claims because, even measured under the more lenient mixed-motive standard applicable to NYCHRL claims, Torres' claims would fail to clear summary judgment. *See Cobb v. Ellab Inc.*, No. 22 Civ. 1002, 2024 WL 1963430, at *5 (N.D.N.Y. May 2, 2024).

---

[4] Defendants analyze Torres' NYSHRL discrimination claim under the standards utilized for NYCHRL claims. Mot. at 16 n.1.

The mixed-motive framework diverges from *McDonnell Douglas* at the third step: after the plaintiff has established a *prima facie* case of discrimination and the defendants have come forward with admissible evidence of a legitimate, nondiscriminatory basis for the adverse employment action. *Hamburg v. N.Y.U. Sch. of Med.*, 62 N.Y.S.3d 26, 32 (N.Y. App. Div. 2017). At that point, under the *McDonnell-Douglas* framework, the plaintiff bears the burden of showing that the proffered justification was a pretext for discrimination. *Id.* Under the mixed-motive framework, however, the plaintiff need only come forward with evidence from which it could be found that "unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for [the] adverse employment decision." *Id.* (quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40–41 (N.Y. App. Div. 2012)). Under the NYCHRL, "summary judgment . . . is appropriate only if the record establishes as a matter of law that discrimination played *no* role in the adverse employment action." *Krimsky v. WestRock Co.*, No. 23 Civ. 6252, 2026 WL 2654753, at *5 (S.D.N.Y. Sep. 9, 2026) (cleaned up) (applying this standard to NYSHRL and NYCHRL claims at the third *McDonnell-Douglas* step).

Here, for the reasons reviewed above, Torres has not met even her *prima facie* burden under *McDonnell Douglas*. That alone would require entry of summary judgment for the defense on her NYSHRL claims. *See Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 462 (S.D.N.Y. 2023); *Zheng-Smith v. Nassau Health Care Corp.*, 486 F. Supp. 3d 611, 621 (E.D.N.Y. 2020), *aff'd*, No. 20 Civ. 3544, 2021 WL 4097316 (2d Cir. Sep. 9, 2021). In all events, even assuming she had, she would fail at the third step, which the Court would reach given defendants' evidence of a neutral basis for Torres' termination and consequent ineligibility for further supplemental pension contributions. *See Wheeler*, 694 F. Supp. 3d at 462 n.12 ("[E]ven had the Court found a *prima facie* case of such discrimination, the assembled record

would require entry of summary judgment for [defendant] on the third *McDonnell Douglas* step."). That is because the record does not contain any evidence supporting that discrimination played any role in these employment actions. As reviewed above, the evidence shows without contradiction a neutral basis for these actions. And it lacks any evidence from which a discriminatory motive could be inferred. To the contrary: (1) Gerrity's reorganization efforts eliminated the roles of several younger, Caucasian men in addition to Torres, Defs.' 56.1 ¶ 133; (2) the Caucasian men who received severance packages, unlike Torres, were not offered jobs with the Archdiocese, which was the basis for Torres' not receiving severance, *id.* ¶¶ 133–134, and Torres has not shown them to be comparators; and (3) the one colleague to whom Torres points who shares some of Torres' protected characteristics—a Hispanic female who resigned from the Trustees—*was* offered severance when she voluntarily left the Trustees, *id.* ¶ 165. And, as to the Archdiocese, there is no evidence that it ever reinstated a lapsed job offer to a person who, like Torres, had failed to timely accept it. *See* Pl. Dep. at 261.

The Court therefore grants summary judgment to defendants on Torres' NYSHRL claims.

### C. Retaliation Claims

Defendants next move against Torres' claim for gender-based retaliation under Title VII.[5] Mot. at 21. The *McDonnell-Douglas* burden-shifting framework applies to these claims. *See Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015) ("Retaliation claims under Title VII [are] analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting

---

[5] Torres argues a retaliation claim under the NYSHRL in briefing, but there is no such claim in the AC. *See* Opp'n at 35–36. Regardless, the evidence does not support a retaliation claim under any source of law, principally because, as reviewed here, defendants became aware of the only activity that Torres argues is protected—her retention of counsel—after Gerrity decided to terminate her.

evidentiary framework.”). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show “(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.” *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (cleaned up).

Torres had not adduced evidence to meet even her *prima facie* burden. The one act of protected activity she cites is “retaining counsel.” Opp’n at 35. She argues that, when the Trustees and the Archdiocese “became aware of this” on May 11, 2023, “they retaliated by terminating [Torres’] contract for Supplemental Pension benefits.” *Id.* But the evidence is flatly inconsistent with that timeline. It uniformly shows that, on May 3, 2023, Gerrity told Torres of the decision to terminate her, effective May 15, 2023. Defs.’ ¶ 79. Torres’ termination ended her eligibility for the supplemental pension, which is available only to Trustees employees. *Id.* ¶ 146. Eight days later, during the afternoon of May 11, 2023, defendants first became aware that Torres had retained counsel when her lawyer sent a letter to O’Sullivan. *Id.* ¶¶ 111–112. And there is no suggestion in the record that Torres complained about discrimination or retaliation to anyone, or engaged in any other protected activity, at any time before the decision to terminate her was communicated to her. *Id.* ¶¶ 100, 113, 193, 196. Because Torres’ termination “took place before [Torres] engaged in any protected activity, she cannot establish a causal link between her termination and her complaints.” *Wilcox v. Cornell Univ.*, 986 F. Supp. 2d 281, 288 (S.D.N.Y. 2013); *see also Uddin v. City of New York*, 427 F. Supp. 2d 414, 433 (S.D.N.Y. 2006) (“[A]dverse actions which take place before defendant [becomes] aware of the protected activity must be dismissed.” (citation omitted)).

The Court thus grants summary judgment to defendants on Torres’ retaliation claims.

### D. Hostile Work Environment Claims

The AC references a hostile work environment in its discrimination claims under Title VII and the ADEA. AC ¶¶ 37, 42, 47. Defendants move against such claims. Mot. at 19. Even had these claims been measured under the more lenient NYSHRL standard, defendants would have been entitled to summary judgment.

Torres bases her hostile work environment claims on her deposition testimony that "Gerrity and [] O'Sullivan aggressively spoke to [Torres], held impromptu meetings, did not say 'good morning,' told her to close cabinets more quietly, and assigned her menial tasks." Opp'n at 31 (evidentiary citations omitted). But those actions, viewed together, would not permit a finding of liability. Under the NYSHRL, "[s]tatements that are 'unwelcome and upsetting' do not create a hostile work environment if they 'do not reflect obvious discrimination or speak to Plaintiff's standing in the workplace.'" *Garrison v. Am. Sugar Ref., Inc.*, 789 F. Supp. 3d 291, 314 (S.D.N.Y. 2025) (quoting *Maynard v. Montefiore Med. Ctr.*, No. 18 Civ. 8877, 2021 WL 396700, at *15 (S.D.N.Y. Feb. 4, 2021)). Torres testified that she was never subjected to any specific comments or remarks related to her age, gender, or race by anyone. Defs.' 56.1 ¶ 155. And, for the reasons reviewed above, there is zero evidence tying Gerrity's and O'Sullivan's treatment of Torres to any protected characteristic of hers.

The evidence thus does not give rise to a triable factual dispute as to the existence of a hostile work environment. *See, e.g.*, *Garrison*, 789 F. Supp. 3d at 314–15 (granting summary judgment to defendant on NYSHRL claims where discourteous conduct and statements to Black plaintiff did not indicate that plaintiff was treated less well than other colleagues or demean the status of plaintiff's protected class in a professional setting); *Marseille v. Mount Sinai Health Sys., Inc.*, No. 18 Civ. 12136, 2021 WL 3475620, at *11 (S.D.N.Y. Aug. 5, 2021) (plaintiff does not raise a triable issue of fact on a hostile work environment claim where none of her

allegations were "based on facially discriminatory conduct"); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (granting summary judgment to defendants on hostile work environment claim because plaintiff failed to adduce evidence that hostile work environment was created because of her protected characteristics).

The Court grants summary judgment to defendants on the hostile work environment claims.

**E. Contractual Interference Claim**

Defendants next move against Torres' claim for tortious interference with contractual relations. Mot. at 25. Under New York law, the elements of such a claim are (1) "the existence of a valid contract between the plaintiff and a third party," (2) "defendant's knowledge of that contract," (3) "defendant's intentional procurement of the third-party's breach of the contract without justification," (4) "actual breach of the contract," and (5) "damages resulting therefrom." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 398–99 (S.D.N.Y. 2023) (quoting *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019)).

Count Six of the AC alleges that the Archdiocese interfered with Torres' "contractual relations with" the Trustees, causing Torres "to be wrongfully terminated." AC ¶¶ 62–63. At her deposition, asked to explain what that allegation meant, Torres stated, "I can't. I was hoping you could tell me." Pl. Dep. at 262.

Torres was employed at will and without an employment contract. Defs.' 56.1 ¶ 18. Torres testified that she did not have a contract with the Trustees. Pl. Dep. at 262. Her brief opposing summary judgment argues that "the Supplemental Pension is a contract," Opp'n at 36, but it does not adduce evidence to that effect. *See Whelan v. Parisi*, No. 25 Civ. 3000, 2026 WL 2323431, at *5–6 (S.D.N.Y. Aug. 11, 2026) (at-will employees terminated before they could

retire and receive retiree health benefits under employer's policies failed to allege existence of implied contract for benefits and pension).

In any event, even assuming the supplemental pension bespoke a contract of some sort, the evidence would not sustain a claim that any such contract was breached by the Trustees, let alone that the Archdiocese procured any such breach.

As to a breach by the Trustees, the AC did not allege such a breach and Torres has not cited evidence of one. Her brief declares that the Trustees "intended to breach the [supplemental pension] through wrongful termination." Opp'n at 36. But the evidence does not supply any evidence of a contractual commitment by the Trustees either not to terminate Torres or not to take action that caused contributions to her supplemental pension to cease. The undisputed evidence instead is that the Trustees retained sole discretion to set the terms of, amend, or terminate the supplemental pension, Defs.' 56.1 ¶ 141, and that, under the terms of the pension, Torres' ability to participate in it ceased upon her termination, *id.* ¶ 21. And there is no evidence that the existence of the pension plan limited the Trustees' discretion to terminate at-will employee Torres. *See Baron v. Port Auth. of N.Y. & N.J.*, 271 F.3d 81, 85 n.2 (2d Cir. 2001) (existence of pension plan did not "limit an employer's right to discharge an at-will employee or give rise to a legally enforceable claim by the employee against the employer" (quoting *De Petris v. Union Settlement Ass'n*, 657 N.E.2d 269, 276 (N.Y. 1995))). In sum, there is no basis on which a jury could find Torres' termination, or the consequent cessation of contributions to her supplemental pension, a breach by the Trustees of any agreement. *See, e.g.*, *Eminah Props. LLC v. Energizer Holdings, Inc.*, 531 F. Supp. 3d 593, 606 (E.D.N.Y. 2021) (dismissing plaintiffs' tortious interference with contract claim "because plaintiffs do not allege any actual

breach of their contract"); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1376 (N.Y. 1996) (affirming dismissal of tortious-interference claim on same ground).

Nor has Torres adduced evidence supporting that the Archdiocese procured such a breach or otherwise intentionally interfered with Torres' rights under the supplemental pension plan. For such a claim to be viable, "the evidence must show that the defendant's objective was to procure . . . a breach" of "the third-party's contract with the plaintiff." *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, No. 14 Civ. 7529, 2016 WL 5414979, at *5 (S.D.N.Y. Mar. 18, 2016) (emphasis omitted). Torres contends that the Archdiocese "acted in concert" with the Trustees to end her eligibility for the supplemental pension. Opp'n at 36–37. But the record does not support that claim. It supports that Gerrity, a Trustees executive, alone made the decision to terminate Torres, Defs.' 56.1 ¶ 73; that Gerrity was not aware that Torres participated in the supplemental pension when she decided to terminate Torres, *id.* ¶ 143; and that, after deciding to terminate Torres, Gerrity discussed the Trustees' contracting with the Archdiocese for human-resources services with O'Sullivan, the Archdiocese employee who oversaw such services, *id.* ¶ 76. At that point, O'Sullivan decided to offer Torres a job with the Archdiocese. *Id.* Gerrity did not object to that proposal, because she thought that, if supervised by O'Sullivan, an experienced human-resources professional, and her team, Torres could provide value to the Archdiocese. *Id.* ¶ 78.

Torres notes that she emailed O'Sullivan and the Archdiocese's general counsel with a query about the supplemental pension. Opp'n at 36 (citing Defs.' 56.1 ¶ 96). But that email, which Torres presumably cites to show the Archdiocese's awareness of her participation in the pension plan, does not fortify this claim. The undisputed evidence is that the Archdiocese lacked authority to offer Torres the supplemental pension, a Trustees benefit reserved for Trustees

employees. Defs.' ¶¶ 146, 150. And the Archdiocese's O'Sullivan, responding to Torres, did no more than notify her, correctly, that she remained eligible to collect the pension when she retired but that contributions would cease upon the termination of Torres' employment with the Trustees, because only Trustees employees were eligible for pension contributions. *Id.* ¶ 98. There is no basis on which a jury could find that the Archdiocese interfered (let alone intentionally) with Torres' rights under the supplemental pension. *See Alpha Cap. Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp. 3d 623, 632–33 (S.D.N.Y. 2018) (granting summary judgment based on lack of evidence that defendant "intentionally procured" the alleged breach).

Because no reasonable jury could infer that the Archdiocese intentionally procured a breach of the Trustees' contractual obligations with respect to Torres, the Court grants summary judgment to the Archdiocese on this claim.

**F. Intentional Infliction of Emotional Distress Claim**

Defendants move against Torres' claim for intentional infliction of emotional distress. Mot. at 24. Under New York law, that claim has four elements: "(1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Kumar v. N.Y.C. Sch. Constr. Auth.*, No. 10 Civ. 3559, 2011 WL 5929005, at *10 (S.D.N.Y. Nov. 29, 2011) (citing *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)). Torres admits that she did not suffer any emotional distress as a result of defendants' actions. Defs.' 56.1 ¶ 203. And in her opposition brief, Torres stated that she "understands and agrees with Defendants' argument" in opposition to this claim, and that she "cannot and will not make an argument as to emotional distress." Opp'n at 36. The Court grants summary judgment to defendants on this claim.

## CONCLUSION

For the above reasons, the Court grants defendants' motion for summary judgment in full and dismisses all claims in the AC, with prejudice. The Clerk of Court is respectfully directed to terminate all pending motions, and to close this case.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: October 29, 2026
New York, New York